UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:  DENNIS C. RANDALL HOLMAN and                    No. 20-11199-j7
        DONA K. HOLMAN,

        Debtors.

ILENE J. LASHINSKY, UNITED
STATES TRUSTEE,

        Plaintiff,

v.                                                      Adversary No. 21-1031-j

DENNIS C. RANDALL HOLMAN,

        Defendant.

## **MEMORANDUM OPINION**

The United States Trustee ("UST") seeks to deny Dennis C. Randall Holman's discharge

under 11 U.S.C. § 727(a)(2)[1] (transfer or concealment of property within a year of the petition or

during the case made with the intent to hinder, delay, or defraud a creditor), § 727(a)(4)(A) (false

oath or account), and § 727(a)(7) (acts proscribed by § 727(a)(2), (4) committed within a year of

the petition date in connection with another case concerning an insider). As evidence of the

intent element required to deny Mr. Holman's discharge under § 727(a)(2) and (a)(4)(A), the

UST contends that Mr. Holman engaged in a fraudulent scheme involving a loan obtained under

the Paycheck Protection Program ("PPP") of the CARES Act, and that such scheme evidences

Mr. Holman's knowing and fraudulent intent to make a false oath or account at a § 341(a)

meeting of creditors and his intent to defraud a creditor with respect to an alleged transfer of

approximately $352,000. Mr. Holman objects to the admission of any evidence relating to the

---

[1] All future statutory references are to title 11 of the United States Code, unless otherwise specified.

PPP loan as outside the scope of the UST's complaint. The Court overruled that objection. The Court held a three-day trial on the merits and took the matter under advisement.

After carefully considering the evidence in light of the requirements to deny the discharge under § 727(a)(2), (a)(4)(A), and (a)(7), the Court concludes that the UST has failed to demonstrate by a preponderance of the evidence that Mr. Holman knowingly and fraudulently made a false oath or account at the Total Oilfield Solutions, LLC ("TOS") meeting of creditors or that the alleged transfer by TOS to MSI, Inc. ("MSI") of approximately $352,000 (or any other transfer by TOS to MSI) was made with the intent by Mr. Homan to defraud First American Bank ("FAB") or the Small Business Administration ("SBA"). The Court reaches these conclusions despite considerable evidence of improprieties in TOS's PPP loan application, PPP loan draw requests, use of PPP funds, and PPP loan forgiveness application.

CLAIMS AT ISSUE IN THIS ADVERSARY PROCEEDING

The UST commenced this adversary proceeding by filing a complaint on November 9, 2021.[2] The UST did not amend the Complaint. The Complaint consists of two counts. Count 1 alleges that the Court should deny Mr. Holman a discharge in his bankruptcy case under § 727(a)(4)(A) and (a)(7) because Mr. Holman "knowingly and fraudulently, in connection with the case, made a false oath or account by testifying under oath at the Chapter 11 § 341(a) Meeting of Creditors [in the TOS case] that the transfer of funds from TOS to MSI was to 'cover payroll,' when in truth, MSI was no longer doing business and had no employees."[3]

---

[2] *See* Complaint Seeking Denial of Defendants' Discharge under 11 U.S.C. § 727(a) ("Complaint") – Doc. 1
[3] Complaint, ¶ 43.

-2-

Count 2 alleges that the Court should deny Mr. Holman a discharge in his bankruptcy case under § 727(a)(2) and (a)(7) because "[s]ometime around the spring of 2020," Mr. Holman, with intent to defraud a creditor, caused or permitted the transfer or concealment of approximately $352,000 from TOS to MSI within one year prior to the filing of Mr. Holman's bankruptcy petition and in connection with the TOS bankruptcy case.[4] Discovery closed on March 31, 2023.[5]

On April 20, 2023, Mr. Holman filed a motion in limine to preclude the UST from asserting a new theory not pled in the Complaint.[6] The motion alleges that because the UST's objections to discharge are limited to an alleged transfer of $352,000 and an alleged false oath relating to a $352,000 transfer, the UST should not be permitted to assert or put on evidence that TOS obtained a PPP loan and PPP loan draws by fraud, misused PPP funds, and submitted a fraudulent PPP loan forgiveness application.[7] The UST's response asserts that the UST's theory of the case has not changed from that alleged in the Complaint.[8] The UST maintains that "evidence of PPP loan fraud is admissible as substantive evidence to prove the *mens rea* required by the counts alleged in the Complaint."[9]

In the Pretrial Order,[10] the Court ruled that the two claims at issue this adversary are:

> First, at issue is Plaintiff's claim that Defendant's discharge should be denied under sections 727(a)(4)(A) and 727(a)(7) because Defendant knowingly and fraudulently made a false oath or account by testifying under oath at a § 341(a) meeting of creditors in the TOS chapter 11 case (and later adopted that testimony in Defendant's own bankruptcy case) that the transfer of approximately $352,000.00 from TOS (an insider of Defendant who filed its own chapter 11

---

[4] Complaint ¶¶ 39, 47-50.
[5] Fourth Stipulated Order Amending Order Resulting from Scheduling Conference and Vacating and Resetting Pre-Trial Conference – Doc. 40.
[6] Doc. 47. The motion in limine also asks the Court to preclude Mr. Speidel from giving expert testimony.
[7] Doc. 47.
[8] Doc. 55, p. 22.
[9] *Id.*
[10] Doc. 65.

case) to MSI was made to cover payroll. Second, at issue is Plaintiff's claim that Defendant's discharge should be denied under sections 727(a)(2) and 727(a)(7) because Defendant with intent to hinder, delay, or defraud creditors First American Bank and/or the Small Business Administration caused TOS to transfer approximately $352,000.00 to MSI within 1 year prior to commencement of the TOS chapter 11 case or during the case.[11]

The Court also ruled:

> Plaintiff's contentions regarding an alleged PPP fraudulent scheme involving Defendant, TOS, and MSI are not new claims. The Court has ruled that evidence of the alleged PPP scheme is admissible under Fed. R. Evid. 404(b) to the extent it is probative of Defendant's motive, intent, knowledge, or other state of mind that Plaintiff must prove in connection with Plaintiff's objections to discharge. *See* Order – Doc. 61. The Court will assess the probative value of such evidence after hearing the evidence. *Id*. Defendant objects to that ruling and has preserved his objection without the necessity of interposing further objections at trial, but he may interpose further objections at trial. Notwithstanding the Order, by ruling on objections made at trial the Court may limit testimony relating to the TOS PPP loan if the testimony is unnecessarily cumulative, or may exclude evidence relating to TOS PPP loan that is not probative of Defendant's motive, intent, knowledge, or other state of mind.[12]

The basis for the Court's ruling regarding the admissibility of evidence relating to the alleged PPP fraud is stated in an order ruling on Mr. Holman's motion in limine.[13]

FACTS[14]

A. *Mr. Holman*

Mr. Holman is 51 years old. After high school, he worked on a road construction crew. He took some college courses but did not obtain a degree. He attended welding school, graduating from the welding program with a welding certificate. Mr. Holman also went to maintenance school and became a journeyman mining mechanic underground. He worked as an

---

[11] Pretrial Order, ¶ 2(c)(i) – Doc. 65.
[12] *Id.* at ¶ 2(c)(ii).
[13] Doc. 61.
[14] The Facts section of this Memorandum Opinion sets forth the Court's findings of fact made in accordance with Fed. R. Civ. P. 52(a), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

-4-

underground mining mechanic for about eleven years. Mr. Holman did not have any managerial responsibilities at the mine. Since around 2002, Mr. Holman has been working in the oilfield business, primarily working as a salesperson and manager of field operations.

Mr. Holman does not have a background in accounting or finance and is not particularly savvy when it comes to the financial side of business management. He has never taken any courses in finance or accounting. Rather, his strengths are securing new business and serving as field manager, setting up jobs, scheduling employees to work at various project sites, and overseeing field crews. He has taken a hands-off approach to the financial aspects of managing the business, relying on a controller and an accountant to oversee the business's finances, including processing payroll and preparing tax returns.

B. *Madron Services, Inc.*

In 2005, Mr. Holman began working for Phil Madron and his company, Madron Services, Inc. ("Madron Services"), as a salesman. He later was promoted to general manager. Madron Services provided roustabout services to its customers including operators involved in oil and gas production in New Mexico. As general manager of Madron Services, Mr. Holman supervised field employees and set up jobs, such as welding jobs and pipeline pipefitting jobs. He would also bring in new work for Madron Services, meeting with companies to create relationships and offering those companies work that Madron Services would perform. However, he was not involved in Madron Services' finances.[15]

---

[15] Madron Services experienced financial problems in or around 2013 or 2014, and sometime in late 2014 or early 2015, it ceased doing business.

C.  *MSI*

In or around January of 2015, Phil Madron formed MSI as a New Mexico corporation. Like Madron Services, MSI provided general roustabout services to oil and gas operators in New Mexico. Phil Madron initially served as MSI's president and sole shareholder. Later, Mr. Madron appointed Mr. Holman as Vice-President, and then, President of MSI. While working at MSI, Mr. Holman stayed in the field 90% of the time, serving as field manager and securing jobs for the company. Even though Mr. Holman was the named president of MSI, his job duties at MSI were substantially the same as they were when Mr. Holman worked for Madron Services. Mr. Madron and his accountants handled MSI's finances.

Around June 2019, Mr. Holman and Mr. Madron entered into a Stock Purchase Agreement for the sale of Mr. Madron's stock in MSI to Mr. Holman for $6,450,000.[16] Mr. Holman believed when he purchased the MSI stock that MSI owned the equipment, land, building, trucks, backhoes, cranes, and vehicles used in MSI's business. After Mr. Holman purchased MSI, he discovered that MSI had significant outstanding state and federal tax liabilities.[17] In addition, several of the significant assets Mr. Holman believed MSI owned, including vehicles and equipment, remained titled in Madron Services' name. As a result of these discoveries, Mr. Holman stopped paying Mr. Madron under the Stock Purchase Agreement. Mr. Madron and Madron Services later sued Mr. Holman and TOS.[18]

---

[16] *See* Exhibit 3.
[17] *See* Exhibit 9.
[18] The parties ultimately reached a settlement.

In July 2019, Mr. Holman obtained a loan on behalf of MSI from Carlsbad National Bank ("CNB") for $350,000 (the "CNB Loan").[19] Mr. Holman personally guaranteed the CNB Loan.[20] The purpose of the CNB Loan was to cover payroll expenses of MSI.[21]

D.  *TOS*

Mr. Holman formed TOS in or around April 2019 at the suggestion of Bill Golden, who served as accountant for both Madron Services and MSI. Mr. Holman understood from Mr. Golden that it would be better to set up a new company for a fresh start. Even though it was formed in 2019, TOS did not formally have any employees until April 1, 2020. MSI's employees were then switched to TOS by a book entry in TOS's business records.

TOS operated prior to MSI's employees becoming TOS's employees on April 1, 2020. As of December 31, 2019, TOS had gross income of $19,400 and a net operating loss of – $5,142.07.[22] By the end of the first quarter of 2020, TOS generated $416,008 in income and incurred $168,507 in expenses from operations.[23] It therefore appears, since no evidence was presented to the contrary, that TOS used MSI employees before April 1, 2020.

After April 1, 2020, on advice of Mr. Golden, MSI began transferring its assets to TOS. TOS and MSI had some commonality of customers and, like MSI, TOS performed roustabout services in the oilfield business. TOS also performed other services that MSI did not. For example, TOS worked on some government projects and environmental cleanup projects. Mr. Holman wanted TOS to expand that type of business, including soil remediation and environmental cleanups.

---

[19] *See* Exhibit Z.
[20] *Id.*
[21] *Id.* at p. 6 (The stated purpose of the loan is "Business Line of Credit for Payroll").
[22] *See* Exhibit 12.
[23] *See* Exhibit AA.

Beginning in October 2019, Thomas Warren, through his company T & C Bookkeeping and Consulting ("T & C Bookkeeping"), served as TOS's accountant. Shawna Cheff served as its controller. Thomas Warren prepared TOS's tax returns based on the business records Ms. Cheff provided to him. Although Mr. Holman involved himself more in the finances of TOS than he had with MSI, Mr. Warren and Ms. Cheff were primarily responsible for financial management of TOS. Ms. Cheff was authorized to issue TOS checks and stamp them with Mr. Holman's signature. She also prepared the payroll records for TOS. Shawna Cheff did not testify at the trial on the UST's claims objecting to Mr. Holman's discharge. Counsel for the UST represented to the Court that he was unable to locate Ms. Cheff.

E. *The PPP Loan*

On or about April 13, 2020, Mr. Holman, on behalf of TOS, borrowed $1,012,000.00 from FAB, guaranteed by the SBA, pursuant to a government-guaranteed loan program known as the Payroll Protection Program, or PPP. PPP loans are subject to restrictions and guidelines regarding how loan proceeds may be spent, including payroll, rent, mortgage, interest, and utilities.

a) *TOS's PPP Loan Application*

TOS's controller, Shawna Cheff, prepared the PPP loan application with Mr. Holman's input.[24] Ms. Cheff and Thomas Warren reviewed the PPP loan application with Mr. Holman, and Mr. Holman then signed and initialed the PPP loan application on behalf of TOS.[25] The loan application is dated April 1, 2020. Mr. Holman relied on Ms. Cheff and Mr. Warren to provide information to FAB to obtain the PPP Loan for TOS. To be eligible for a PPP loan, TOS was

---

[24] Mr. Holman testified that TOS's accountant, Thomas Warren, assisted in preparing the PPP loan application together with Ms. Cheff. Mr. Warren denied that he filled out the PPP loan application.
[25] *See* Exhibit 40.

required to certify that it was in business and had employees as of February 15, 2020.[26] The employee list attached to TOS's PPP loan application reflects MSI's employees, not TOS's employees.[27] Such employment list is from a quarterly payroll report prepared by Ascentis (a payroll company) for MSI, and states on its face that it is a payroll report for "MSI, Inc."[28] There was no intent on the part of TOS, Mr. Warren, or Mr. Holman to cover up the fact that the employee list attached to TOS's PPP loan application identified MSI's employees, not TOS's employees. That fact was disclosed to FAB.

      Mr. Ray Withers, the bank representative at FAB who was the contact person for TOS's PPP loan application, dealt primarily with TOS's controller, Shawna Cheff. FAB approved TOS's PPP loan application despite the fact that the application was based on employees of MSI, not TOS.[29] The MSI employees were not transferred to TOS by a book entry until April 1, 2020.

      b) *TOS's PPP Loan Draw Requests*

      The procedure for FAB to fund the TOS PPP loan was that TOS would submit draw requests to FAB with supporting documentation. The supporting documentation for a draw request included copies of TOS payroll checks to its employees to be funded by the draw. Upon approval of a draw request, FAB would issue a loan disbursement check and TOS would deposit the funds into a TOS bank account at CNB ending in 3423.[30] Between April 23, 2020 and

---

[26] *Id.*
[27] *Id.* at p. 23.
[28] *Id.*
[29] There is conflicting testimony regarding whether FAB knew that the TOS PPP loan application was based on employees of MSI who would later become TOS's employees. Mr. Withers testified that he did not know, and that FAB would not have approved the PPP loan if it had known, that TOS was not eligible to obtain a PPP loan because it did not have any employees as of February 15, 2020. Mr. Holman and Mr. Warren testified that FAB was aware and authorized TOS to submit its PPP loan application based on MSI employees who would later become TOS employees for purposes of the PPP loan.
[30] *See* Exhibits 52 and 52A.

-9-

September 15, 2020, TOS received ten PPP loan draws for a total PPP loan disbursement to TOS of $1,011,989.21.[31] TOS "was living off" of the PPP loan for the following six to eight months.[32]

Mr. Holman relied on Ms. Cheff to take care of submitting the documentation to obtain draws on the PPP loan. Ms. Cheff submitted the supporting documentation to FAB to obtain draw requests on the PPP loan. TOS payroll checks included in the supporting documentation bear Mr. Holman's signature from a rubber signature stamp that Ms. Cheff had authority to use. Mr. Holman was not copied on the emails Ms. Cheff sent to FAB to obtain draws on the PPP loan.[33] There is no evidence that Mr. Holman saw or was otherwise aware of the payroll checks or other supporting documentation that Ms. Cheff submitted to FAB to obtain PPP loan draws.

Several of the payroll checks submitted in support of the PPP loan draw requests never cleared the bank.[34] FAB, which provided funds to TOS for those checks, was unaware that the checks were not negotiated and that the loan proceeds were not used to fund the checks. In addition, several of the checks contain a notation for "safety bonuses" or "per diem" payments.[35] TOS did not have a "safety bonus" program or provide "per diem" reimbursements to its employees. There is no evidence that Ms. Cheff had authority to stamp Mr. Holman's signature on fraudulent checks on behalf of TOS and submit them to FAB to obtain PPP loan draw requests. Mr. Holman did not authorize Ms. Cheff to make payments to TOS employees for safety bonuses or per diem amounts. There is no evidence that Mr. Holman was aware that several of the checks submitted in support of the PPP loan draw requests never cleared the bank.

---

[31] *Id.*
[32] *See* Exhibit 38A, p. 64 (Testimony of Mr. Holman).
[33] *See* Exhibit 51A.
[34] *See* Exhibits 50 and 50A.
[35] *See* Exhibit 50A.

c) *TOS's PPP Loan Forgiveness Application*

Under the PPP, PPP loans would be forgiven if the funds were used to pay for eligible expenses, including "payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments."[36] In addition, payroll costs paid with PPP loan proceeds must equal at least 60% of the PPP loan amount.[37] To obtain forgiveness of the PPP loan, Thomas Warren and Shawna Cheff prepared a PPP Loan Forgiveness Application on behalf of TOS in February of 2021. FAB filled in a portion of the PPP Loan Forgiveness Application form. Mr. Holman did not participate in the preparation of the form. Mr. Warren signed the PPP Loan Forgiveness Application on behalf of TOS and submitted it to FAB on or about February 5, 2021.[38] Mr. Holman was copied on the email submitting the PPP Loan Forgiveness Application to FAB, which included ten attachments.[39] The documentation submitted in support of the PPP Loan Forgiveness Application included the same checks submitted to obtain the draws on the PPP loan, including payroll checks that were never cashed.[40] Although the supporting documentation was included as attachments to the email submitted to FAB in support of the PPP Loan Forgiveness Application, on which Mr. Holman was copied, Mr. Holman did not open or review the attachments. FAB forgave TOS's PPP loan.

Despite the uncashed checks TOS used to obtain draws on the PPP loan and submitted in support of the PPP Loan Forgiveness Application, it appears that TOS may nevertheless have met the payroll requirements for PPP loan forgiveness. PPP requires as a condition to loan forgiveness that at least 60% of the PPP loan is used for the borrower's payroll expenses. Sixty

---

[36] Exhibit 46, p. 5.
[37] *Id.*
[38] Exhibit 46, p. 5.
[39] Exhibit M.
[40] *Id.*

percent of TOS's $1,012,000.00 PPP loan is $607,200. [41] The UST's summary charts admitted in evidence show that $527,173.20 of TOS's PPP loan proceeds were used for TOS payroll based on National Payment Corporation records of TOS's employee payroll.[42] However, the last payroll record in evidence (Exhibit 55A) is dated September 4, 2020, which pre-dates the last PPP loan draw TOS received on September 15, 2020, in the amount of $76,309.16.[43] Exhibit 55A also does not account for salary that TOS paid to Mr. Holman which was not processed through National Payment Corporation. Between April 27, 2020 and June 15, 2020, Mr. Holman received $30,506.40 in salary from TOS not reflected in the National Payment Corporation records covering the same period.[44]

---

[41] Exhibit 55 reflects that weekly payroll for TOS employees processed through National Payment Corporation from August 7, 2020, through September 4, 2020, ranged from a low of $23,337.11 to a high of $30,114.22. To qualify for PPP loan forgiveness, 60% of the loan proceeds must be spent on payroll. *See* Exhibit N (Paycheck Protection Program PPP Loan Forgiveness Application Form 3508EZ, Line 7). Sixty percent of $1,012,000 is $607,200. $527,173.20 (TOS payroll post-PPP loan as reflected in Exhibit 55) + $30,506.40 (Mr. Holman's regular salary not included in the National Payment Corporation payroll records after 4/23/20 through 6/15/20 paid from TOS's CNB account ending in 3202) + $50,000 (estimated two weeks of TOS weekly payroll following the final PPP loan draw based on August 2020 historic average) = $607,679.60. *See* Exhibits 55 and 55A (summary of TOS payroll and National Payment Corporation records through 9/3/20); Exhibits 56 and 56A (summary and checks from TOS operating account including checks in the amount of $3,813.30 to Mr. Holman after 4/23/20 through 6/15/20).

        The Court's estimate of TOS's payroll expenses after the last PPP loan draw may be overly conservative. A payroll summary report submitted as part of the PPP Loan Forgiveness Application reflects total gross pay of $34,523.53 for the period from 9/06/20 through 9/12/20, and $31,001.87 for the period from 9/13/20 through 9/19/20. Exhibit M, bates-stamped MR. HOLMAN0000195. Quarterly Federal Tax returns reflect $560,664.37 in TOS wages for the third quarter of 2020 with 24 employees, and $611,872.38 in TOS wages for the fourth quarter of 2020 with 10 employees. *See* Exhibits C and D.

[42] *See* Exhibits 55 and 55A.

[43] *See* Exhibits 52 and 52A.

[44] *See* Exhibits 55, 55A, 56, and 56A. The checks in Exhibit 56A include eight checks from TOS's CNB bank account ending in 3202 payable to Mr. Holman in the amount of $3,813.30 each, with the designation of "Payroll Check" on the face of the check. *See* Exhibit 56A, pp. 33, 35, 37, 39, 41, 43, 45, and 47.

F.  *Intercompany transfers between MSI and TOS and TOS's Use of PPP Loan Proceeds*

Shortly after TOS was formed in April of 2019, MSI deposited $100,000 into the TOS account for startup capital, booked by TOS as a loan amount it owed MSI.[45] After that, TOS and MSI continued to operate as parallel companies, transferring funds back and forth as needed. TOS kept a running intercompany transfer ledger ("Intercompany Transfer Ledger") to track the transfers between TOS and MSI.[46]

Based on the evidence, the Intercompany Transfer Ledger, with a few relatively minor exceptions, accurately reflects the transfers between TOS and MSI.[47] Every entry in the "Account" column in the Intercompany Transfer Ledger is identified as "Loan – MSI."[48] The Intercompany Transfer Ledger records more than 250 transfers back and forth between the companies for the period from April 2, 2019, to May 5, 2021.[49]

Transfers were made back and forth, for purposes such as the purchase of job materials and fuel, and for operating expenses. TOS bought equipment and vehicles from MSI that TOS used in its business. TOS paid off loans in MSI's name for equipment and vehicles because TOS

---

[45] *See* Exhibit A.
[46] *Id.*
[47] The few minor exceptions in evidence consist of several small transfers to MSI of $25.00 and $50.00 made in April, May, and June of 2020, which together total $375.00, and a transfer of $5,000 to MSI on January 21, 2021, reflected in TOS CNB bank records that are not reflected in the Intercompany Transfer Ledger. *Compare* Exhibits 56 and 56A with Exhibit A. Other than those exceptions, the transfers to MSI reflected in the TOS CNB bank records in evidence match the transfers documented in the Intercompany Transfer Ledger. The Court was unable to track all the transfers documented in the Intercompany Transfer Ledger against CNB bank records because not all bank records for the time period covered in the Intercompany Transfer Ledger were offered into evidence. The UST chose not to offer into evidence Exhibit 17 (TOS's CNB bank statements and checks from May 2020 – June 2020), Exhibit 24 (TOS's CNB bank statements and deposit slips from March 2020 to June 3, 2020), or Exhibit 25 (MSI's CNB bank statements and checks from June 2, 2020 to July 2020). In addition, a designation in the Intercompany Transfer Ledger of a transfer of $25.57 on December 31, 2019, as having been disbursed from a PPP account cannot be correct, since the PPP loan was not obtained until April of 2020. *See* Exhibit A.
[48] Exhibit A.
[49] *Id.*

used the equipment and was unable to refinance the loans in the name of TOS. By June of 2019, TOS had paid back the initial $100,000 that MSI had transferred to TOS.[50] But shortly thereafter, and until December of 2019, TOS owed money to MSI.[51] At the end of 2019, MSI owed money to TOS.[52]

Just prior to the time FAB funded TOS's first PPP loan draw request on April 23, 2020, MSI owed TOS $378,487.68.[53] As of June 15, 2020, when the Holmans and TOS  commenced their respective chapter 11 bankruptcy cases, MSI owed TOS $401,421.35.[54] The last entry in the Intercompany Transfer Ledger reflects $409,671.35 owing by MSI to TOS as of May 5, 2021.[55] The TOS chapter 11 case converted to a case under chapter 7 on June 25, 2021.

TOS did not make a single loan to MSI in the amount of approximately $352,000.[56] However, MSI did owe TOS approximately $352,000 before the PPP loan was made. Prior to the first draw on the PPP loan, TOS owed MSI $352,766.29 as of February 26, 2020, and $352,170.29 as of February 28, 2020, as a result of transfers back and forth between the companies.[57] Those are the only "loan" amounts TOS owed MSI in the $352,000 to $353,000 range.

TOS transferred all the PPP loan funds disbursed by FAB into TOS's bank account at CNB ending in 3423.[58] At least $203,674.30 of PPP loan funds in the CNB account ending in

---

[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id*.
[57] *Id.*
[58] *See* Exhibit 42A, p. 11 (identifying CNB account ending in 3423 as a "Paycheck Protection Program" account); Exhibit 52 (PPP loan transfers summary chart); and Exhibit 52A (FAB checks and CNB deposit slips).

3423 were transferred to TOS's operating account at CNB ending in 3202.[59] At least after June 14, 2020, when TOS made the transfer of $203,674.30 from its CNB account ending in 3423 to TOS's operating account ending in 3202, TOS's operating account consisted of TOS PPP loan funds commingled with funds derived from TOS's operations. After the first draw on the PPP loan on April 23, 2020, MSI continued to "loan" funds to TOS by transferring funds into the TOS operating account, and TOS continued to "loan" funds to MSI by transferring funds from the TOS operating account to MSI. Between April 23, 2020, and May 5, 2021, TOS transferred $90,750 to MSI from the CNB operating account, and MSI transferred $114,146.33 into TOS's operating account.[60] After June 14, 2020, which is the date the evidence establishes that TOS comingled PPP loan funds with funds in its operating account, TOS transferred $88,750 to MSI and MSI transferred $82,500 to TOS.[61]

The Intercompany Transfer Ledger reflects two transfers of $20,000 each from TOS to MSI, one on June 12, 2020, and the other on June 16, 2020, from a CNB account identified as "CNB -3423 PPP ACCT."[62] At trial, the UST questioned Mr. Warren about these entries. Mr. Warren indicated that the notes in the Intercompany Transfer Ledger were primarily made by Ms. Cheff and that those entries reference a transfer from the PPP loan account. Mr. Warren testified further that to his knowledge, none of the transfers to MSI reflected in the Intercompany Transfer Ledger are from funds TOS obtained under the PPP loan. The UST did not specifically

---

[59] *See* Exhibit 56A, p. 5 (reflecting a transfer on June 14, 2020, of $203,674.30 from an account ending in 3423 to an account ending in 3202). Exhibits 17 and 24, consisting of additional bank statements from TOS's bank accounts at CNB, were not offered into evidence. Such bank statement would likely establish whether any additional PPP loan disbursements from FAB were deposited in TOS's operating account.
[60] Exhibit A.
[61] *Id.*
[62] *Id.*

question Mr. Holman about the two $20,000 transfers reflected in the Intercompany Transfer Ledger.

Notwithstanding the testimony of Mr. Warren, the two $20,000 transfers to MSI made in June of 2020, reflected in the Intercompany Transfer Ledger are traceable to the PPP loan.[63] The evidence does not establish that Mr. Holman was aware of the two $20,000 transfers of PPP loan proceeds from TOS to MSI.

The UST presented additional evidence of certain transfers from TOS to Mr. Warren's business, T & C Bookkeeping. TOS transferred a total of $380,490.27 to T & C Bookkeeping between May 5, 2020, and June 15, 2020.[64] Of that amount, $331,107.61 could be from PPP loan proceeds, given the timing of the payments to T & C Bookkeeping and the timing of the PPP loan draws.[65] At least a substantial portion and possibly all of the funds transferred to T & C Bookkeeping were transferred for T & C Bookkeeping to hold for TOS as a reserve to pay taxes, if necessary, on PPP loan forgiveness income and to pay for services that T & C Bookkeeping rendered for TOS.[66] T & C Bookkeeping returned all but $111,815.97 of those funds to TOS at the request of the Subchapter V Trustee in TOS's bankruptcy case.[67] At least a portion of the $111,815.97 not returned to TOS was used to pay T & C Bookkeeping for services rendered to TOS. The evidence does not establish that Mr. Holman intended TOS's transfer of funds to T &

---

[63] Exhibit A.

[64] *See* Exhibits 53 and 53A.

[65] *See* Exhibits 52 and 52A (PPP loan draws) and Exhibits 53 and 53A (checks to T & C Bookkeeping). Check number 10251 in the amount of $127,433.31 dated May 20, 2020, and check number 10408 in the amount of $203,674.30 dated June 15, 2020, together total $331,107.61. Exhibits 53 and 53A. TOS received a PPP loan draw in the amount of 133,748.32 on May 15, 2020, a PPP loan draw in the amount of $113,016.74 on June 5, 2020, and a PPP loan draw in the amount of $157,201.71 on June 11, 2020. Exhibits 52 and 52A.

[66] Check numbers 10178, 10313, 10218, 10319, and 10360 are all in the amount of $3,100.00, which Mr. Warren testified was T & C Bookkeeping's weekly charge to TOS for accounting services. The memo line on check number 10401 in the amount of $10,391.33 states "Professional Fees." Exhibit 53A, p. 8.

[67] *See* Exhibit 54 and Exhibit 54A showing checks from T & C Bookkeeping to TOS totaling $268,674.30.

C Bookkeeping as a means to conceal from FAB or the SBA an improper use of PPP loan proceeds.

TOS's transfers of funds to MSI from TOS's operating account ending in 3202 after TOS's first PPP loan draw, TOS's transfer of $40,000 of PPP loan proceeds to MSI, and TOS's transfer of funds to T & C Bookkeeping were not made with intent on the part of Mr. Holman to hinder, delay, or defraud FAB or the SBA.

G. *The Bankruptcy Filings*

Mr. Holman and his spouse[68] filed a voluntary petition under chapter 11 of the Bankruptcy Code on June 15, 2020. Mr. Holman signed Schedules A/B-J and a Statement of Financial Affairs for Individuals Filing Bankruptcy ("SOFA") under penalty of perjury and filed them in the bankruptcy case on June 29, 2020. On the same date, Mr. Holman caused TOS to file a voluntary petition for bankruptcy as Case No. 20-11198-j11. Mr. Holman's individual bankruptcy case converted to chapter 7 on August 3, 2021.

TOS's bankruptcy schedules filed June 29, 2020, identify a loan from TOS to MSI in the amount of $352,311.00.[69] That figure is the amount stated on a TOS balance sheet as of June 11, 2020, identified as "Loan – MSI."[70] On June 11, 2020, MSI actually owed TOS $381,421.35, as reflected in the Intercompany Transfer Ledger.[71] On July 15, 2020, the day before the § 341(a)

---

[68] The UST named Dona K. Holman and Mr. Holman as defendants in this adversary proceeding. The parties later stipulated to the dismissal of Dona K. Holman from this proceeding.  *See* Stipulated Order Dismissing Claims as to Dona K. Holman – Doc. 57.

[69] *See* Exhibit 28, p. 7.

[70] *See* TOS bankruptcy case No. 20-11198-j7 - Doc. 3. At trial, the Court took judicial notice of the docket and the documents on the docket of TOS's bankruptcy case No. 20-11198j7, Mr. and Mrs. Holman's bankruptcy case No. 20-11199-j7, and this adversary proceeding. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial noticed of its docket); *In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 8 (1st Cir. 1999) (citing Fed. R. Evid. 201 and concluding that "[t]he bankruptcy court appropriately took judicial notice of its own docket.").

[71] *See* Exhibit A.

meetings in TOS's and the Holmans' individual chapter 11 bankruptcy cases, TOS amended its bankruptcy schedules to correct the amount of the "Loan with MSI, Inc." to $401,421.35 as of the petition date (June 15, 2020).[72] The $401,421.35 figure matches the amount of the running balance MSI owed TOS reflected on the Intercompany Transfer Ledger as of June 12, 2020, and remained the balance as of June 15, 2020, when the Holmans and TOS commenced their respective chapter 11 cases.[73] The Intercompany Transfer Ledger shows that as of July 16, 2020, the date of the § 341(a) meetings in the Holmans' and TOS's bankruptcy cases, MSI owed TOS $416,421.35.[74]

H.  *The § 341(a) Meetings of Creditors*

The UST held § 341(a) meetings of creditors in TOS's chapter 11 bankruptcy case and in Mr. Holman's individual bankruptcy case on July 16, 2020.[75] The meetings were conducted by telephone. At the time, Mr. Holman was not feeling well. He had just received concerning news about his health from his doctor. Mr. Holman is hard of hearing and experienced some difficulty hearing all of the questions clearly over the phone. Mr. Holman indicated multiple times during TOS's meeting of creditors that he had trouble hearing questions, and the audio cut out several times during the telephone-conducted creditors' meeting.[76]

At one point during the TOS meeting of creditors, Mr. Madron's attorney asked Mr. Holman several questions. The transcript reflects the following exchange:

Q.  All right. And then on the balance sheet, I wanted to ask you a couple questions about that. It shows under Other Current Assets, a loan, it looks – I guess it's a loan to MSI for $352,000 and some change. What's that for?
A.  That was MSI, sir.
Q.  Yeah, I know it's MSI, but was TOS loaning money to MSI?

---

[72] *See* Exhibit 36, p. 40 and Exhibit A.
[73] Exhibit A.
[74] *Id.*
[75] *See* Exhibits 33 and 34.
[76] *See* Exhibit 33.

-18-

A. That was to cover payroll, sir. Every bit of that money that I took from the loan went to pay payroll—to make payroll. Every bit of it.

Q. Well, was that monies that you took out of PPP to pay – payroll over at MSI?

A. No, sir. That was a personal loan I took out for the company.

Q. Okay. So—so this loan that's shown as an asset of TOS to MSI was a loan to MSI for payroll?

A. That's correct.

Q. And when was that loan made?

A. First quarter of 2020.[77]

In further questioning by Mr. Madron's attorney, Mr. Holman confirms that TOS transferred money to MSI so that MSI could make loan payments to CNB, and that such transfers were part of TOS's $400,000 loan to MSI.[78] The UST later asks Mr. Holman about a $400,000 loan from TOS to MSI made in the first quarter of 2020 to keep everything afloat in order to pay payroll, and Mr. Holman confirms it even though there was no such loan.[79] Mr. Holman also confirms that MSI owes TOS $400,000 "as we sit here today" [July 16, 2020].[80]

At the § 341 meeting of creditors held in the Holmans' individual bankruptcy case, Mr. Madron's attorney questions Mr. Holman about what the attorney guesses is a loan for $352,000 and some change by TOS to MSI reflected on a TOS balance sheet and whether the obligation was for MSI payroll purposes.[81] Mr. Holman testified in response that he obtained "a payroll loan for 352, I think, thousand dollars for payroll only, my line credit."[82] This testimony is clearly a reference to the CNB Loan Mr. Holman obtained on behalf of MSI in 2019 for payroll purposes. Mr. Holman refers to that loan as a personal loan he took out for the company, conflating his personal guarantee of the loan with the identity of the borrower.

---

[77] Exhibit 33, p. 11.

[78] Exhibit 33, p. 15.

[79] *Id.* at p. 17.

[80] *Id.*

[81] Exhibit 34, p. 29.

[82] *Id.*

At a deposition taken November 16, 2022, Mr. Holman provided an explanation for his responses at the § 341(a) meetings. He explained that the approximately $352,000 reflected on TOS's schedules as a loan to MSI was for the equipment loans TOS was paying on behalf of MSI.[83] In addition, Mr. Holman confirmed that MSI did in fact get a loan for payroll in 2019 in an amount coincidentally nearly the same as the "352" loan he was asked about at the creditor's meeting.[84] Mr. Holman also clarified at his deposition that there was no separate note executed by MSI in favor of TOS.[85]

At trial, Mr. Holman explained that during the § 341 meeting of creditors, he confused the $352,000 "loan" from TOS to MSI he was asked about with the $350,000 CNB Loan Mr. Holman obtained on behalf of MSI in 2019 to cover payroll. He also believed that TOS was paying for equipment on behalf of MSI, resulting in MSI owing money to TOS.

Mr. Holman did not knowingly or fraudulently make a false oath or account at the TOS § 341(a) meeting of creditors when testifying in response to questioning about an entry on a balance sheet that Mr. Madron's attorney characterized as a "loan [by TOS] to MSI for $352,000 and some change."[86] Mr. Holman believed his testimony was truthful. In responding to the questioning, Mr. Holman confused the $350,000 loan MSI obtained from CNB in 2019 to cover MSI's payroll with the approximately $352,000 amount that MSI owed to TOS incorrectly reflected in the original schedules filed in the TOS bankruptcy case as a "Loan with MSI, Inc."[87]

The Court finds that Mr. Holman's testimony about his having understood the question as asking about the loan MSI obtained from CNB to make payroll is credible for several reasons.

---

[83] *See* Exhibit 38A, pp. 76-77.
[84] *Id.* at p. 82-83.
[85] *See* Exhibit 38A, pp. 74-75.
[86] Exhibit 33, p. 11.
[87] *See* Exhibit 28, p. 7.

-20-

First, there was no single separate loan from TOS to MSI for approximately $352,000 as suggested by the question.[88] The question was unintentionally misleading based on an incorrect entry on a TOS balance sheet. Second, the $352,000 amount of the "loan" from TOS to MSI is very similar to the amount of the CNB Loan Mr. Holman obtained on behalf of MSI in 2019 for $350,000 with a stated purpose of "payroll." Mr. Holman acknowledged at his deposition that the loan for MSI payroll is a "completely separate loan" from the $352,000 TOS subsequently loaned to MSI.[89] Finally, it is clear from other aspects of Mr. Holman's testimony at the § 341(a) meetings that he did not have a good recollection or clear understanding of events in responding to various lines of inquiry.

At a status conference held in TOS's bankruptcy case in July of 2021, the UST asked Mr. Holman about the PPP loan and whether any funds from the PPP loan were used to pay MSI's payroll.[90] Mr. Holman responded, "not that I know of."[91] And at his deposition held November 2022, Mr. Holman affirmatively states that "[W]e didn't use PPP funds for MSI. We used them

---

[88] At a status conference held in the TOS bankruptcy case on July 7, 2021, Mr. Holman stated that he believed there was a promissory note between MSI and TOS, and that he probably signed the note on behalf of MSI because he had to sign everything. *See* Exhibit 35, p. 36. That statement is inconsistent with Mr. Holman's other testimony and is factually incorrect. No promissory note signed by MSI in favor of TOS was presented in evidence. The Court finds that Mr. Holman was simply mistaken in his response at the status conference. Just prior to that line of questioning Mr. Holman states that he is having a hard time and is "not feeling good." Exhibit 35, p. 35.

[89] Exhibit 38A, p. 83. The transcript from Mr. Holman's November 16, 2022, deposition reflects the following exchange between counsel for the UST and Mr. Holman:

> Q: All right. So, Mr. Holman, a few moments ago, we were going through a reference to 352, I guess $352,000 that was borrowed by MSI in 2019. Is that a different $352,000 than the $352,000 that was loaned – at least purported to have been loaned from TOS to MSI a year later?
> A: That is a completely separate loan.
> Q: And it's just coincidence that the amounts happen to be about the same?
> A: That is correct.

Exhibit 38A, pp. 82-83.

[90] Exhibit 35, p. 28.

[91] *Id.*

for TOS," and that "All the PPP went to TOS."[92] Mr. Holman gave this testimony based on his belief that TOS did not transfer PPP loan funds to MSI even though such belief was incorrect.

I. *Mr. Holman's Intent*

Overall, the Court finds Mr. Holman's testimony regarding his knowledge and intent in relation to TOS's PPP loan credible. Mr. Holman is not sophisticated in financial matters. He heavily relied on TOS's accountant and/or its controller to handle the financial affairs of MSI and TOS, including the preparation of payroll and tax returns, the documentation of intercompany transfers, and the submission of the PPP loan application, PPP draw requests, and the PPP Loan Forgiveness Application. Mr. Holman did not intend to hinder, delay, or defraud FAB or the SBA with respect to any transfers by TOS to MSI and did not knowingly or fraudulently testify falsely or give a false account at the TOS meeting of creditors in relation to money loaned by TOS to MSI.

DISCUSSION

The UST claims that the Court should deny Mr. Holman's discharge on two grounds. First, the UST requests denial of Mr. Holman's discharge under § 727(a)(2) and (a)(7) because Mr. Holman with intent to hinder, delay or defraud creditors FAB and/or the SBA caused TOS to transfer approximately $352,000.00 of PPP loan proceeds to MSI within one year prior to

---

[92] Exhibit 38A, p. 44. The transcript from the November 16, 2022, deposition reflects the following exchange:

    Q.  I did have a question. There was an account at CNB Bank where payroll was being paid out, it looks like payroll was paid out; so, you know, you get the loan through First American Bank. Then draws are made, and then deposited into CNB Bank.  Why was that process used? In other words, why was— why were funds taken out of First American Bank and put into CNB Bank? Was that for payroll purpose? Or did you have an operating account at CNB Bank; do you remember?

    A.  We didn't use PPP funds for MSI. We used them for TOS.

    Q.  Okay.

    A.  All the PPP went to TOS.

Exhibit 38A, p. 44.

commencement of the TOS chapter 11 case. Second, the UST requests denial of Mr. Holman's

discharge under § 727(a)(4)(A) and (a)(7) because Mr. Holman knowingly and fraudulently

made a false oath or account by testifying under oath at a § 341(a) meeting of creditors in the

TOS chapter 11 case (and later adopting that testimony in his own bankruptcy case) that the

transfer of approximately $352,000.00 from TOS (an insider of Mr. Holman who filed its own

chapter 11 case) to MSI was made to cover payroll.

### 1. *Section 727(a)(7)*

Under § 727(a)(7), a chapter 7 debtor will not be granted a discharge if the debtor

commits any of the acts specified by paragraphs (2) through (6) of § 727(a) "on or within one

year before the date of the filing of the petition, or during the case, in connection with another

case, under this title . . . concerning an insider." § 727(a)(7). Here, Mr. Holman's statements

made and actions taken in connection with the TOS bankruptcy case, filed concurrently with Mr.

Holman's individual bankruptcy case and within a year of the conversion of Mr. Holman's

individual bankruptcy case to chapter 7, subject Mr. Holman to objections to discharge under

§ 727(a)(2) and (a)(4)(A) in his individual chapter 7 case. The Court will address in turn each of

the UST's objections to discharge.

### 2. *Objection to Discharge Under § 727(a)(2)*

Section 727(a)(2) provides:

The court shall grant the debtor a discharge, unless—
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of
> the estate charged with custody of property under this title, has transferred,
> removed, destroyed, mutilated, or concealed, or has permitted to be transferred,
> removed, destroyed, mutilated, or concealed—
>> (A) property of the debtor, within one year before the date of the filing of
>> the petition; or
>> (B) property of the estate, after the date of the filing of the petition[.]

-23-

§ 727(a)(2). To deny a debtor's discharge under this subsection, the objecting party must demonstrate

> by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed or mutilated (2) property of the estate, (3) within one year prior to the bankruptcy filing [or post-petition], (4) with the intent to hinder, delay, or defraud a creditor.

*Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997). Intent to "hinder, delay, or defraud a creditor" under § 727(a)(2) requires actual intent; constructive intent is not sufficient. *See Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991) ("To deny a discharge under § 727(a)(2), a court must find *actual* intent . . . ."); *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008) (same, quoting *Carey*); *Gepner v. Kidd (In re Kidd)*, No. 11-05291, 2015 WL 6437480, at *6 (10th Cir. BAP Oct. 23, 2015) (unpublished) (same).[93]

The Court need not decide whether § 727(a)(2) necessarily requires proof of fraud or whether actual intent to hinder or delay creditors can be enough to deny the discharge.[94] Under either construction of § 727(a)(2), the UST has not proven intent to hinder, delay, or defraud creditors.

---

[93] *Accord In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010) ("'[A]ctual, rather than constructive, intent is required' on the part of the debtor." (quoting *Khalil v. Developers Sur. & Indem. Co. (In re Khalil),* 379 B.R. 163, 172 (9th Cir. BAP 2007), *aff'd,* 578 F.3d 1167, 1168 (9th Cir.2009)).

[94] In an opinion designated as non-precedential, the Tenth Circuit has determined that § 727(a)(2) does not necessarily require proof of fraud; actual intent to "hinder or delay creditors" can be enough to deny discharge. *Rupp v. Pearson*, 658 F. App'x 446, 450 (10th Cir. 2016) To the same effect, *see In re Wiggains*, 848 F.3d 655, 661 (5th Cir. 2017); *Retz*, 606 F.3d at 1200; *Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir. 1994). *See also Freelife Int'l , LLC v. Butler (In re Butler)*, 377 B.R. 895, 915 (Bankr. D. Utah 2006) ("As the statutory language makes clear, denial of discharge 'need not rest on a finding of intent to *defraud*. Intent to hinder or delay is sufficient.'" (quoting *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996))). *But see Los Alamos Nat'l Bank v. Wreyford (In re Wreyford),* 505 B.R. 47, 58 (Bankr. D.N.M. 2014) (the phrase, "hinder, delay, or defraud creditors" used in § 727(a)(2)(A) has a specialized meaning in the law and requires proof of fraudulent intent).

*Fraudulent Intent*

Proof of a debtor's fraudulent intent may be proven by circumstantial evidence including inferences based on a debtor's course of conduct. *Warren*, 512 F.3d at 1249 ("Fraudulent intent . . . may be established by circumstantial evidence, or by inferences drawn from a course of conduct." (quoting *Farmers Coop. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982))); *Quicken Loans, Inc. v. Splawn (In re Splawn),* 376 B.R. 747, 755 (Bankr. D.N.M. 2007) ("Intent to hinder, delay, or defraud . . . may be shown through circumstantial evidence from which the Court may infer actual intent to hinder, delay, or defraud creditors."). Because a debtor seldom readily admits to his or her own subjective fraudulent intent, courts often consider "badges of fraud," such as 1) whether the debtor retained possession, benefit, or use of the property transferred, or 2) whether the transfer was disclosed or concealed, to determine whether the debtor acted with the requisite fraudulent intent. *Wreyford)*, 505 B.R. at 58 ("Because actual fraudulent intent is seldom based on direct evidence, courts rely on circumstantial evidence often referred to as 'badges of fraud' from which fraudulent intent under § 727(a)(2)(A) may be inferred.").[95] A "pattern of wrongful behavior" may indicate wrongful intent sufficient to deny

---

[95] Badges of fraud include the following:
> (1) the lack or inadequacy of consideration;
> (2) the family, friendship or close associate relationship between the parties;
> (3) the retention of possession, benefit or use of the property in question;
> (4) the financial condition of the party sought to be charged both before and after the transaction in question;
> (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
> (6) the general chronology of events and transactions under inquiry. . . .
> (7) whether the transfer was disclosed or concealed;
> (8) whether the debtor made the transfer before or after being threatened with suit by creditors (a variant of factor (5));
> (9) whether the transfer involved substantially all of the debtor's assets;
> (10) whether the debtor absconded; and
> (11) whether the debtor was or became solvent at the time of the transfer.

*Wreyford*, 505 B.R. at 58-59 (citations omitted).

-25-

discharge under §727(a)(2). *Butler*, 377 B.R. at 916. "Evidence of fraudulent conduct which itself cannot form the basis for denial of discharge nevertheless may be considered on the issue of fraudulent intent." *Id.* at 917 (quoting *In re Locke*, 50 B.R. 443, 452 (Bankr. E.D. Ark. 1985)).

The UST asserts that Mr. Holman caused or permitted the transfer of approximately $352,000 of PPP loan proceeds in the spring of 2020 to MSI with the intent to hinder, delay or defraud creditors FAB and/or the SBA. The focus of the UST's claim is that Mr. Holman acted with fraudulent intent rather than with the intent to hinder or delay. But the facts do not establish that Mr. Holman acted with the requisite actual intent necessary to deny his discharge under § 727(a)(2), whether based on an intent to defraud a creditor, hinder a creditor, *or* delay a creditor.

The UST's premise is that Mr. Holman's fraudulent intent with respect to TOS's transfer of PPP loan proceeds to MSI should be inferred because the funds were transferred as part of a larger PPP loan scheme in which Mr. Holman participated that was designed to defraud FAB and the SBA. Over Mr. Holman's objection, the Court admitted the UST's evidence relating to the alleged fraudulent PPP loan scheme as relevant to the intent requirement for denial of discharge based on the UST's § 727 claims. The alleged fraudulent PPP loan scheme itself is not otherwise part of the UST's claim. At closing argument, the UST argued that Mr. Holman permitted the transfer of even more than $352,000 in PPP loan proceeds from TOS to MSI as part of the alleged fraudulent PPP loan scheme.

There is substantial evidence of PPP loan improprieties by TOS including (1) supporting the PPP loan application with an MSI payroll report instead of a TOS payroll report to satisfy the PPP requirement that TOS had employees as of February 15, 2020, (2) the submission of fraudulent TOS payroll checks to FAB in support of TOS's PPP loan draw requests and PPP

-26-

Loan Forgiveness Application, and (3) TOS's transfer of $40,000 of PPP loan proceeds to MSI as reflected in the Intercompany Transfer Ledger. The UST contends that the transfer of PPP loan proceeds to T & C Bookkeeping was also part of the fraudulent scheme. But, other than reliance on MSI employees to obtain the PPP loan (a fact that was disclosed to FAB), the UST has not proven by a preponderance of the evidence that Mr. Holman authorized or had any knowledge of any of the foregoing improprieties or any other PPP loan improprieties by TOS.

Mr. Holman has no background in accounting or finance and is unsophisticated in financial matters. He relied heavily on his controller, Shawna Cheff, and his accountant, Thomas Warren, to manage the financial affairs of TOS, including TOS's compliance with the requirements of the PPP. Given that Mr. Holman's strengths are getting new business and managing jobs in the field, and that he lacks sophistication in financial matters, Mr. Holman hired a controller and an accounting expert to manage the business finances of TOS and MSI, including all aspects of TOS's PPP loan. He relied on those experts with respect to all aspects of TOS's PPP loan. Although "reckless indifference" or "extreme carelessness"[96] can support a finding of fraudulent intent, the Court declines, based on the totality of the circumstances in this case, to infer that Mr. Holman acted with fraudulent intent sufficient to deny discharge under § 727(a)(2) based on his reliance on a controller and accountant with respect to all aspects of TOS's PPP loan. *See Kidd*, 2015 WL 6437480, at *7 ("Subjective intent to defraud [under § 727(a)(2)] may be inferred from a totality of the circumstances, including a debtor's reckless

---

[96] *Cox v. Villani (In re Villani)*, 478 B.R. 51, 61 (1st Cir. BAP 2012) ("[Debtor] demonstrated the type of extreme carelessness or reckless indifference that equates to fraud and a bar to discharge [under § 727(a)(2)], rather than benign inattention to detail."). *See also Neary v. Guillet (In re Guillet)*, 398 B.R. 869, 888 n.65 (Bankr. E.D. Tex 2008) (recognizing that "reckless indifference for the truth can establish fraudulent intent" but cautioning that the court "must not be reckless with the 'reckless disregard' standard, given the fact that liability under § 727(a) must be based on an actual fraudulent intent, not merely a constructive one.").

-27-

disregard for the truth."). Ms. Cheff, who could have provided additional information about the TOS PPP loan, her role as TOS's controller, and her interactions with Mr. Holman about TOS's finances, did not testify at trial.

Further, the UST's § 727(a)(2) claim is tied to a "$352,000 transfer" from TOS to MSI. The "$352,000 transfer" was not a single loan but apparently was based on an incorrect dollar amount listed on a TOS balance sheet as of June 11, 2020.[97] That error was perpetuated on the schedules TOS filed but later corrected to $401,421.35 per the Intercompany Transfer Ledger.[98] The $401,421.35 figure is the amount MSI owed TOS on June 15, 2020, when TOS commenced its chapter 11 case, as a result of hundreds of transfers back and forth between MSI and TOS beginning in April of 2019.[99]

At closing argument, the UST asserted that evidence of transfers of PPP loan proceeds to a commingled account containing PPP loan proceeds and other funds taints the entire account so that all funds in the commingled account are deemed PPP loan proceeds. The UST argues that any funds in the commingled TOS operating account used for a purpose not permitted under the PPP therefore is a transfer made in violation of the PPP. The UST relies on money laundering cases which can subject an entire account to forfeiture if it is demonstrated that both tainted and untainted funds were "pooled . . . to facilitate, *i.e.,* disguise the nature and source of, his scheme." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998). [100]

The Court need not decide whether money laundering caselaw is applicable here. After TOS's first draw on the PPP loan on April 23, 2020, TOS transferred a total of $130,750 to MSI

---

[97] *See* TOS bankruptcy case No. No. 20-11198-j7 – Doc. 3.
[98] *See* Exhibit 28, p. 7, Exhibit 36, p. 40, and Exhibit A.
[99] *See* Exhibit A.
[100] The UST also questioned how TOS could have paid $100,000 back to MSI in 2019 as reflected in the Intercompany Transfer Ledger when TOS's total income for 2019 was only $19,400. Repayment of the initial cash infusion by MSI is irrelevant to the UST's objections to discharge.

-28-

(of which it transferred $90,750 from its operating account) and MSI transferred $114,146.33 back to TOS.[101] Even if the Court were to assume that all funds in the TOS operating account consisted of PPP loan proceeds after the first PPP loan draw, TOS transferred a maximum of $130,750 of PPP loan proceeds to MSI through a series of intercompany transfers, not approximately $352,000 or more by a loan made in the spring of 2020 as the UST alleged.

Further, the Court has found that Mr. Holman did not have the intent to defraud, hinder or delay FAB or the SBA with respect to the PPP loan proceeds that TOS transferred to MSI. That finding is not dependent on whether all the funds in TOS's operating account are deemed to be PPP loan proceeds as a matter of law after TOS commingled PPP loan proceeds with other funds in the TOS operating account. The Court's finding of no actual intent by Mr. Holman to defraud, hinder, or delay FAB or the SBA with respect to TOS's transfer of PPP loan funds to MSI also takes into account the evidence of PPP loan improprieties regarding the PPP loan application, PPP loan draws, use of PPP funds, and the PPP Loan Forgiveness Application, as well as evidence relating to the transfer of PPP loan funds to T & C Bookkeeping.

Therefore, the Court will deny the UST's objection to discharge under § 727(a)(2).

3. *Objection to Discharge Under § 727(a)(4)(A)*

Section 727(a)(4)(A) provides:

> The court shall grant the debtor a discharge unless—
>> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>>> (A) made a false oath or account[.]

§ 727(a)(4)(A). To deny a debtor's discharge under § 727(a)(4)(A) based on false oath, the moving party "must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact." *Brown,* 108 F.3d at

---

[101] *See* Exhibit A.

1294. Testifying falsely at a meeting of creditors can serve as grounds for denial of discharge under § 727(a)(4)(A). *U.S. Trustee v. Garland (In re Garland)*, 417 B.R. 805, 814 (10th Cir. BAP 2009) ("A 'false oath' [under § 727(a)(4)(A)] may be either: '(1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at an examination during the course of the proceedings.'" (quoting 6-27 Collier on Bankruptcy ¶ 727.04[1][c] (15th ed. rev. 2009))); *U.S. Trustee v. Vigil (In re Vigil)*, 414 B.R. 743, 747-48 (Bankr. D.N.M. 2009) ("Statements made under oath at a creditor's meeting, answers to interrogatories and deposition testimony can also constitute false statements within the meaning of 11 U.S.C. § 727(a)(4)."). A "reckless indifference to the truth," meaning that the debtor does not care whether a representation is true or false, is often treated as the "functional equivalent of fraud for purposes of § 727(a)(4)(A)." *Butler*, 377 B.R. at 922-23 (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 1987)). However, "mere mistake or inadvertence" or "an honest error or mere inaccuracy" is insufficient grounds for denial of discharge. *Brown*, 108 F.3d at 1294-95.

The UST contends that Mr. Holman knowingly and fraudulently made a false oath or account by testifying at the § 341(a) meeting of creditors that a transfer of approximately $352,000 from TOS to MSI was to "cover payroll" when in truth, MSI was no longer doing business and had no employees.[102] The evidence establishes that Mr. Holman's testimony at the § 341(a) meeting that a loan of $352,000 and change from TOS to MSI to "cover payroll" is false. It is false in two respects. First, TOS did not make a loan to MSI in the amount of approximately $352,000. Second, TOS did not transfer approximately $352,000 to MSI to cover payroll. The question, then, is whether Mr. Holman made that false statement "knowingly and fraudulently" and whether the false statement relates to a material fact. *Brown*, 108 F.3d at 1294

---

[102] *See* Pretrial Order, p. 2 – Doc. 65.

(reasoning that because the incorrect statements in debtor's schedules certified under oath were indisputably incorrect, "the crux of the dispute is whether the oaths were knowing *and* fraudulent and relate to a material fact."). If the Court concludes that the false oath was not knowing and fraudulent, the Court's inquiry ends, and the Court need not determine whether the oaths relate to a material fact. *Id.*

The UST's theory is that Mr. Holman was motivated to testify falsely at the §341(a) meeting of creditors in order to conceal a fraudulent PPP loan scheme. The UST contends that Mr. Holman knew about the improprieties in the PPP loan and was primed to deflect any questions that might raise questions about the PPP loan. Since the § 341 meeting of creditors was held only a few months after TOS obtained the PPP loan, the UST asserts that PPP loan improprieties were at the forefront of Mr. Holman's mind, incentivizing Mr. Holman to testify falsely at the § 341(a) meeting.[103]

The Court has found that Mr. Holman did not knowingly or fraudulently make a false oath or account at the TOS § 341(a) meeting of creditors when testifying in response to the question about a loan by TOS to MSI in the amount of $352,000 and change even though that testimony was untrue. The Court has found for reasons stated above that Mr. Holman mistakenly understood the question as asking about the loan that MSI obtained in 2019 to make payroll and that Mr. Holman believed his testimony was truthful. As a result of those findings, the UST did not satisfy her burden of establishing by a preponderance of the evidence that Mr. Holman knowingly and fraudulently made a false oath or account warranting denial of Mr. Holman's discharge under § 727(a)(4)(A).

---

[103] At trial, Mr. Holman renewed and preserved his objection to the introduction of such evidence notwithstanding the Court's earlier ruling that evidence of the alleged fraudulent PPP loan scheme is admissible for the limited purpose of establishing the intent and *mens rea* elements of the UST's § 727 claims.

CONCLUSION

Parties objecting to discharge are held to a strict standard of proof. *See Brown*, 108 F.3d at 1292 ("The Bankruptcy Code must be construed . . . strictly against the creditor."). The UST did not satisfy her burden of demonstrating by a preponderance of the evidence that Mr. Holman knowingly and fraudulently made a false oath or account at the TOS § 341(a) meeting of creditors or that Mr. Holman transferred, or permitted to be transferred, property of TOS with the intent to hinder, delay, or defraud a creditor.

Much of the evidence presented at trial related to an alleged fraudulent PPP loan scheme admitted in evidence as probative of Mr. Holman's intent. Although the UST proved substantial PPP loan improprieties, the Court found that Mr. Holman did not have the knowledge or intent required to deny his discharge. The Court will enter a separate judgment consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: February 7, 2024

COPY TO:

Jaime A. Pena
Attorney for Plaintiff
DOJ-Ust
P.O. Box 608
Albuquerque, NM 87103-0608

George D. Giddens, Jr.                          Nickay Manning
Attorney for Defendant                          Attorney for Defendant
Giddens, Gatton & Jacobus, P.C.                 Nickay Manning Law Firm LLC
10400 Academy Rd NE Ste 350                     PO Box 1448
Albuquerque, NM 87111-1229                      Corrales, NM 87048-1448

-32-